Mr. Chief Justice, and may it please the Court, under state and federal law, doctors write prescriptions for their patients to allow them access to drugs that the government deems too dangerous for unrestricted sale. Vermont's law allows doctors to decide whether this information that they are compelled to provide to pharmacies may be used in marketing that is directed at them. Drug companies would certainly like to have this information for marketing, but they have no First Amendment right to demand it, just as they have no right to demand access to the doctor's tax returns, his patient files, or to their competitors' business records. Vermont's law does not regulate the content of the marketing pitches and the advertising that drug companies provide about their products or their competitors' products. It regulates access to this information that's created in a highly regulated regime of prescription drugs and in the context of the doctor-patient relationship. The purpose is to prevent sales representatives from contacting particular physicians, right? I disagree, Your Honor. The purpose of the statute is to let doctors decide whether sales representatives will have access to this inside information about what they've been prescribing to their patients. And what the record shows is that what drug companies do is track and monitor doctors very closely to watch when they switch drugs, to watch the trends by which they, doctors prescribe, by gender, by age. And all that information is used to target and to direct the marketing projects of the companies. They could use it for other purposes, right? The pharmaceutical manufacturers?  So what the Chief Justice suggested is right, that the purpose is to stop them from using it in order to market their drugs. The purpose is to allow doctors to decide whether the information should be available. Well, that's right. But that is an impediment to their using it for the marketing of drugs. You're placing that impediment on me. Isn't that the obvious purpose of it? I mean, it doesn't necessarily make it bad, but let's not quibble over what the purpose is. As with any information that the, that might inform a marketing campaign, not having the information may be, make their marketing less effective or make it different. That's the purpose of it, to prevent them from using this information to market their drugs. Again, Your Honor, the purpose is to allow doctors to make the decision. And doctors may want to allow its use or not allow its use. But it's only for that use that you interpose the requirement that the doctor consent. For all other uses, you don't require the doctor's consent, right? The consent requirement in this statute goes to the use for marketing and also to the sale by the pharmacy. And that sale may be for other purposes as well. So there is a consent requirement.  Ginsburg. I'm just going to say, under any of the other uses, like for insurance purposes, cases where the pharmacist is paid for giving out the prescriber information here, the, what they call data miners, are paying the pharmacist to get this information. In the case of other, others who have access, do any of them also pay the pharmacist? Your Honor, there's two sort of answers to that. The first is that with respect to pharmacies, the record shows here that the only place that the pharmacies disseminate their information is to the data vendors, and that is a commercial sale, and it is primarily intended for the marketing purpose. Insurers do have information about doctors' prescribing practices and patient information. They have that internally from their own claims and their data and their relationships with doctors and patients. So insurers are not, do not need to buy the data from pharmacies. They have it without purchasing it. So the data is not private in the sense that the physician who prescribes knows that nobody will know what he's prescribing and how much he prescribes and how often, because there are a lot of people who do know that, right? That's correct, Your Honor. There are people who know what the doctor prescribes and what the patient has received. So the only thing it assures the physician who prescribes is that he won't be bothered by drug companies who, on the basis of their knowledge of information which other people have, approach him in order to market their drugs. That's basically all it assures the prescribing physician, right? It assures the prescribing physician that his information about prescribing practices will not be used for marketing without his consent. It's like the difference between... Okay. And he could achieve the same objective, could he not, by simply refusing to talk to the marketer. When the marketer says, you know, I want to talk to you about a new drug, he says, I don't talk to drug manufacturer marketers. He could not achieve the same result, Your Honor. What the record shows is that doctors were particularly concerned about having access to the best information and the most complete information to make decisions for their patients. And this data, as was discussed by Dr. Grande below, by Dr. Kesselheim, by Mr. Ahari, the former sales representative, they all discussed how the data ends up being used to filter the information that doctors receive. One of the Respondents, one of the Respondents argues that the statute would permit and does permit the use of this information for what they call a counterdetailing effort. Is that correct? It is not correct, Your Honor, to the extent that Respondents have suggested that Vermont's academic detailing program, which is called the Evidence-Based Education Program, uses this data. But that wasn't really my question. My question was, does the statute permit it? If Vermont wanted to do that, the University of Vermont or some other entity wanted to do that, would the statute permit it? Well, the statute would not permit the sale for that purpose, which is a separate provision of the statute, because academic detailing is not an exemption. There would also — and then the question of whether the information would be available would default back to the pharmacy board rules. Could the data be sold to a university for research purposes? The university said, we really want this data to do some research. Could the data be sold to the university for that purpose? Yes, Your Honor. The statute does permit it to be sold for healthcare research purposes. All right. Could the researcher then have a profile, a data bank, that is very helpful to the general public and sell that to the general public, to the newspapers and so forth? We do not believe so, Your Honor, because of the background regulations that govern this information, including Pharmacy Board Rule 20, which we cited at page 4 of our brief, which also places restrictions on disclosure of patient and practitioner — No, no. It's sold to the researcher. The researcher then comes up with a design or database that is very fascinating for a number of reasons. Can that researcher sell it to the New England Journal of Medicine? I'm not sure if I understand whether the question is about the data itself or results drawn from the data. But to the extent that the statute allows the sale of the data for research, the restriction on the other uses would accompany the sale. I'm still not sure, in my hypothetical, what would happen. When the — if the pharmacy sold — Pharmacy sells to the researcher. Right. If that happens — The researcher is at the university. The researcher has a data bank or has some results that are very fascinating. The researcher then wants to sell that to the New England Journal of Medicine. What result under the statute? The statute would have required the pharmacy to prevent the further dissemination of the data except for health care research. You answered my question earlier that they don't sell it to anyone else. That's why I was trying to clarify your answer to Justice Kennedy, because you told me the only sale, the pharmacists, they sell this to the data miners. They do not sell it to the other people. But now you're answering Justice Kennedy's question. Yes, they sell it to the university. I apologize, Your Honor, if I was not clear. As a factual matter, we know absolutely that the pharmacies do not sell it to researchers. I had understood this to be a hypothetical. How does it — If they did. But as a factual matter, they do not. How does it increase the prescribing physician's right of privacy that the data about his prescribing can only be given away but can't be sold? Does that make him feel happier about his privacy? What it allows the doctor to do is to avoid an intrusive and invasive marketing practice. He can do that by saying, I don't want to talk to you. The doctor cannot — can shut off any communication and any information from the pharmaceutical companies by slamming the door on the detailers. But that's not necessarily in the interest of doctors or patients. That may well be, but then don't — just don't tell me that the purpose is to protect their privacy. Now you're arguing a totally different purpose. It makes it easier for the physician to cut off approaches by drug companies that want to sell drugs. If that's the purpose of the statute, it's quite different from protecting his privacy. His privacy isn't protected by saying you can't sell it, but you can give it away. Your Honor, I think the legislature here was using privacy to refer to the autonomy interest that everyone has to some degree in controlling the flow or the use of information about them. And this Court recognized in the Reporters' Committee case in the FOIA context that there was a privacy interest in the aggregation of information on an FBI rap sheet, even though — Absolutely. Assuming there's some form of privacy that relates to not being harassed, because there's certainly a legislative record of doctors or groups of doctors testifying to feeling harassed by detailers. If Thompson requires a less restrictive method, why does this have to be an opt-in rather than an opt-out? Because isn't an opt-out, I call up and say, I don't want you to have this information. So isn't an opt-out less restrictive? An opt-out would not protect the privacy interest as much because it would assume that doctors want to consent. I would like to say that here the statute is — Well, but given the restrictions on speech, why is that a bad thing? Meaning you don't really intend to tell us that the State couldn't and wouldn't just like we got all of that advertising relating to the opt-out on telephone solicitations. Virtually every American knew they could do it if they chose. Maybe some didn't, but a vast majority did. You can't really say Vermont's incapable of telling doctors in a mailing or in some public professional magazine, if you want to opt out, here's the number? Well, in fact, Your Honor, that's exactly what the State does. Every time that the doctors relicense, which is every two years, they get a form and they can make a decision one way or the other on the form that they receive. So it's perfectly tailored to allow the doctors to decide and to not restrict any marketing between a willing listener and a willing speaker. There's another purpose that I would like you to comment on, and that is the State is interested in promoting the sale of generic drugs and correspondingly to reduce the sale of brand-name drugs. And if that's the purpose, why doesn't that run up against what this Court has said, that you can't lower the decibel level of one speaker so that another speaker, in this case the generics, can be heard better? The State does have an interest in reducing health care costs here. But what's important about this statute is the mechanism by which it allows doctors to decide what information and what kind of marketing they want. And it's different because what it's about is access to information in this highly regulated area. It's the difference between a doctor who prescribes a non-prescription drug and a patient who can take that information, walk into the pharmacy with a $20 bill, and leave with their medication, and no one has learned anything about what the doctor prescribed for the patient, about the patient's concerns or the doctor's concerns. You want to lower your health care costs, not by direct regulation, but by restricting the flow of information to the doctors, to use a pejorative word, but by censoring what they can hear to make sure they don't have full information so they will do what you want them to do when it comes to prescribing drugs. Because you can't take, I gather, direct action and tell them you must prescribe generics, right? I disagree, Your Honor, for two reasons. The statute does not limit any of the information that doctors receive. So the State has not in any way intervened in the information that the pharmaceutical manufacturers can provide to the doctors. You're restricting their, you're making it far more burdensome for the manufacturers to reach their intended audience, right? It's as if I want, there's a demonstration in town, all right? They need a permit to hold the demonstration. They get the permit. I want to hold a counterdemonstration. And you're saying it doesn't make any difference whether I know where their demonstration is going to be or not. I disagree, Your Honor. The ability of drug companies to locate the doctors that are interested in their data is very important. Kennedy, you were the one that made the argument that the State has an interest in reducing health care costs. And I assume that is by selling generics. And the Chief Justice asked you a question. In effect, aren't you doing this by regulating speech? And you say no, you disagree. I don't understand that answer that you gave to the Chief Justice. It's not a restriction on speech because it's a restriction only on the access to the information that the pharmaceutical manufacturers would like to use to inform their advertising. And it's only in play if the doctors have objected to the use. It's a restriction. Scalia, information necessary for effective speech is what you're saying, right? Your Honor, it's a restriction. It only restricts the information necessary for really effective speech. No, I disagree. For pharmaceutical manufacturers to approach it. It's a restriction for it because it identifies those doctors that they would like to approach with their information, which may say, you know, our product is much better than the generic. Our quality control is, you know, whatever. There are arguments on both sides of those things. And you are making it more difficult for them to speak by restricting access to information that would enable their speech to be most effective. And their speech would be more effective if they had access to patient information, if they had access to the competitor's trade secrets. There's certainly other information available that they would like to use in And it's our position that in the same way, they do not have a right to demand access to information about the doctor's prescribing practices without his consent. If there are no further questions. Well, we'll give you — we seem to have questions. We'll give you additional time for rebuttal, so you don't worry that we're cutting into that. But you're making a judgment about how their — whether or not their speech will be as effective or not. Don't you think they're the ones who are entitled to make that judgment? It doesn't mean that you're right or wrong. It just means that we would not rely on your determination that it is — their speech is just as effective. They're the ones doing the speaking, and they think it's not. Again, Your Honor, I don't think we disagree that the pharmaceutical manufacturers consider this information useful and helpful in targeting their marketing campaigns. The issue in this case is whether their right trumps the right of the doctor. And if you go back to the source of this information, to the underlying transaction, the doctor prescribing the drug for a patient and the pharmacy dispensing it, the doctor and the pharmacy have the same stake in that transaction. And until this point, the pharmacy has had complete control over whether the information gets sold into this commercial stream for marketing use. And all the statute does is put the doctor on the same — in the same place as the pharmacy in terms of deciding what further use can be made of the information. Could I ask you this question? Do you agree with the Solicitor General's interpretation of the statute? Yes, we do, Your Honor. And did you make that argument below? Is that a change in your position? It is not a change in our position. It is not an issue that was pressed below because of the facts on the ground. There is only one transaction here. There's a sale from the pharmacies to the data vendors for these commercial purposes. But isn't this inconsistent with what you told the court of appeals? In our court of appeals brief, for example, at page 29 to 30, we describe that sentence of the statute as restricting both the sale of the information and the use for marketing on paper. So you're representing to us that you told the court of appeals the statute should be interpreted as the SG is interpreting it here. That's your representation. It is my representation that we did not say anything contrary to that, Your Honor, and that it really was not pressed below. So I would not say that we, in our briefs below, fully laid out the position as the SG has. But we cannot disagree with that. Well, that's an important position. If that indeed was the meaning of the statute, you should have told the court of appeals, don't you think? Is it enough to say we didn't say no? You should have said yes. You should have said this is what it means. And again, Your Honor, if I point also to pages 47 to 48 of our Second Circuit brief, we did frame the issue as whether there was a right to buy and sell prescription records. The issue has always been in the case. But again, the facts on the ground, there's only been this one transaction and that really was what we were litigating about. Well, the court of appeals on page 22A of the petition, summarizing what it understood you to be arguing, says the statute only imposes restrictions on the sale or use of such data for marketing or promoting a prescription drug. That was an inaccurate characterization of your — the Second Circuit did not understand your argument. Again, Your Honor, I don't think that the argument was really framed clearly below, but we did not. Could you please answer yes or no? If you're changing your position, you're changing your position. It seems to me this is an important point. And if the Second Circuit based its decision on a misunderstanding of Vermont's interpretation of its own statute, I would think you'd at least bring that out in a petition for rehearing. I understand, Your Honor. And you did not. We did not. And could you explain how you're going to interpret your statute going forward and apply your statute going forward? Yes, Your Honor. We interpret the first clause of the statute to be a restriction on sale, except for sale for the exemptions that are set forth in the statute and the other provisions of the statute. The second provision is a restriction on the use for marketing, and the third provision is a restriction that would apply to pharmaceutical manufacturers who have obtained the data for permissible purposes and need to abide by the continuing restriction on the use. And the consent provision would apply to each of those parts of the statute. Thank you. We'll afford you five minutes for rebuttal. Okay. Mr. Kneedler. Mr. Chief Justice, and may it please the Court. The Vermont statute protects important interests that the Vermont legislature could recognize in physician autonomy and control over information that concerns them. When a patient brings a prescription to a pharmacy, after that point, the patient information is protected under HIPAA and under State law. That leaves two primary actors in that transaction, the physician and the pharmacy. Both are professionals. Both are subject to regulation under a comprehensive closed system for the distribution of drugs. Prior to the time this statute was enacted, the pharmacy had complete control over the disposition of that information. What this statute does is put the physician, the prescriber, on an equal footing with respect to the pharmacy, with the pharmacy with respect to the use of the information about that prescriber, but only with respect to the use of the information in marketing to that prescriber. It is a narrowly drawn statute that enables the physician, not the State, enables the physician to determine whether the information that he was required to furnish in connection with the prescribing of a drug will be used in the marketing of products to that physician. Roberts. So he's required to provide it, but he would be required to provide it quite apart from the government regulation, right? I mean, the pharmacy needs to know who to make the prescription out. Well, it's because it's a prescription drug. Federal and State law require a prescription for a prescription drug. But if this was not a prescription drug, a person can go into a drug store and purchase a non-prescription drug, just like any other item in a drug store, not have to furnish the name, not have to furnish any of this information. So the information is furnished because of the requirement of a prescription, which is of longstanding. And so this statute is really of a piece with a number of other types of regulations to protect privacy. For example, the Driver's Privacy Protection Act, where a person is required to furnish certain information in order to get a driver's license. That statute prohibits the commercial exploitation of that information. But it doesn't protect his privacy. I mean, his name and the extent of his prescriptions can be given away for a lot of uses. It doesn't protect his privacy. It protects, it enables him to protect himself against drug companies that want to talk to him. And that's the term privacy is used to embrace that sort of autonomy and control over information. That's the way in which we're in. Scalia. So long as I know that's what you're talking about, when you say privacy, you don't mean the prescriber's concern that people will know that he prescribed certain drugs. He doesn't care about that, right? That is not protected by this law. He certainly does care about that. It's not protected by this law. Well, there are other principles that protect it. The State's pharmacy regulations require pharmacies to maintain the confidentiality of the information. Talking about what this law protects. It does not protect his privacy in that sense. It protects his privacy in the sense that it enables him to avoid having to say go away when a salesman for the drug company comes, right? Yes. Well, it's a lesser version of that, a less restrictive version of that, because it doesn't put either the pharmaceutical company or the physician in the position of an all or nothing situation. What the law allows is the physician to say you can come visit me, but I don't want you to use this information that has otherwise been kept confidential under pharmacy rules to market to me. That enables the physician to choose to have what the physician may choose, may see as a more objective presentation. If a physician wanted to. It doesn't even protect his privacy in the sense that it enables him not to have to say go away. It doesn't even protect that. He will still have to say that if the drug company approaches him without having this information. If he doesn't want to talk to the detailer at all. What this allows for, physicians see value to this, but what this allows for is for the physician to say I don't want my information to be used by this drug company in a way, sort of inside information about my overall prescribing practices. I would prefer to have a presentation made to me without the information about me, but information about the drugs that might be. If a doctor wanted to, didn't want the information distributed to anybody, academic researchers, anybody, does the law give the doctor that option? It does not. But that's common in confidentiality statutes. For example, HIPAA, which protects the personal information of persons in the healthcare system, that information can be used and frankly would have to be used, for example, for paying insurance claims. The insurer needs to know what prescriptions or what other medical services might have been provided. The same thing with respect to insurers controlling their costs because there are formularies and preferred drug lists. And so people in that position necessarily have to be able to use prescriber information in order to find out whether something was suitably prescribed under the preferred drug list. So it's not — Our precedents made indicated that it's problematic for the State to make a determination about what uses information can be — to what uses information can be put, particularly when it's an interested party as it is here. Well, what the statute does is allow the physician or the prescriber to make that choice. It's information about the prescriber that the prescriber was required to furnish in connection with the issue of prescription. I thought you told me that this doesn't protect physician privacy to the extent of saying this information can't be used for academic purposes, even if you, the physician, don't want it to be used for those purposes. Right. And again, that's true in a variety of — So the physician doesn't get to decide for what uses the information can be put. Not altogether. But that doesn't mean that there is no confidentiality interest or no autonomy or control interest, because a physician practicing medicine knows that his patient's insurer is going to be — What if the statute — I'm sorry. What if the statute said this information can be used for any number of purposes, except not for anybody who's going to criticize the State of Vermont? No. That would not be permissible. It would not be germane. This information cannot be used for any purposes — can be used for any purposes except a purpose that will make things more expensive for the State of Vermont. Well, I mean, that's a very broad goal. I mean, here what the State has done is put the control in the physician, who is a critical player in the delivery system. So it's narrowly tailored to the physician's use of the information about him in connection with how he will be approached. It's also important to recognize that this is very different from the general advertising cases this Court has had under the commercial speech doctrine. This is not public advertising. This, I think, falls into the camp of Dun & Bradstreet, where you have a targeted, limited business audience, really one-on-one. It's not radio or television advertising. It's one-on-one advertising in which the public interest is much more limited. And it's one-on-one with respect to the very person whose information was first furnished by the physician to the pharmacy. So it is the same. Kennedy So that's because the pharmaceutical company deems this to be the most efficient. What you're saying is that the State can prohibit the most efficient sort of speech, whereas if it just had general dissemination which didn't have to serve any particular purpose, that would be all right. But if it becomes focused and important and effective, then the State can prohibit it. Kneedler It's allowing the other person to that representation visit to decide whether information about him, not other information about him, will be used in that situation. It's very much like a don't do not call statute or a do not mail statute in which people have the right to say, do not contact me for commercial information, except this one is more limited. This one says do not use information about me to contact me. Roberts I don't like to be bothered by people knocking on my door saying sign this petition. Can I, in order to protect my privacy interests, can I prevent that as a general matter? Kneedler No, but you could post a sign saying no solicitations, and I think under this Court's case that's sort of protection. Scalia The State enact a law that say petition signers cannot approach somebody unless he has given his prior consent? Kneedler No, but I think the State could enact a law that said if someone posts a sign saying do not approach me, do not knock on my door for this purpose. Scalia The doctors can do that if they don't want to talk to the patient. Kneedler If they don't want to talk at all. But this is addressed to a more limited problem and therefore is more narrowly tailored, which is that what the pharmaceutical company can't do without the physician's consent is to use information that was gathered about that very individual to approach him. It puts the physician on an equal footing with the pharmacy at the beginning of the stream of commerce. It puts the physician on an equal footing with the pharmacy or the pharmaceutical company at the other end by saying I'm going to keep that information about me to myself if you are approaching me. Ginsburg Mr. Kneedler, in most of our commercial speech cases, there has been a commodity. Here, it's a record maintained by the pharmacist. We think of the pharmacist as selling the brand name or the generic name, but whose list is this? Whose record is it? Is it the pharmacist's record, the way goods, stock and trade would be? Kneedler May I answer the question? It is in the possession of the pharmacy, but what the State has done is to legitimately recognize that the physician has a stake in some of the information on that list, and in that respect, the list is a commodity. The State is regulating its commodity aspect, not its communicative or expressive aspect. I would be willing to consider a case to do so, but I wouldn't be willing to consider  I would be willing to consider a case to do so in this statute. Roberts Thank you, counsel. Mr. Goldstein. Goldstein Mr. Chief Justice, may it please the Court, good morning. You will want to have available to you the red brief of IMS Health Incorporated, which in its appendix reproduces the statutes and findings. We know that statutes like HIPAA do protect private information in third parties' hands and they are constitutional. On the other hand, we also know that a governmental restriction on the use of information could be used to distort the marketplace of ideas. So the case is going to have to be decided somewhere in the middle, and in order to do that, we're going to have to figure out where in the middle Vermont ended up. Now, in doing that, I want to clarify, I think, three things in the questioning of the first half hour. They are about what the practices are at issue here, what this statute does, actually, what's the rule, and why is it that Vermont did it. So as to Justice Ginsburg's question, are there other sales, the State gave you the correct answer that the pharmacy companies don't sell to researchers, but that's somewhat misleading. They sell to us and we sell to the researchers. We sell to the government. The intermediaries like IMS Health, that's because we're the aggregator. So it is not correct to say that the only sale is for pharmaceutical marketing. Second, on the important question of what this statute does. Kagan, I asked you whether there's sales to any other entities. Yes, and I said the State gave you the accurate answer. But the implication of the answer, I think, was not quite correct, because there are sales for purposes other than for marketing. But if this is a general sale provision, then that would include those sales that you're talking about. It would not, because the point would then, and I'll come to the statute in a minute, because all the exemptions, right, so there's a debate that Justice Alito focused on about what does the statute mean. And I do want to turn to that in just a second. But to jump ahead to your question, Justice Kagan, assume that it's a general sale prohibition. Then there are all the exemptions. And the exemptions take all of these other uses out from the sale prohibition for academic research to go to the government and for clinical trials, for health care research. Those are all exempted from the general sale prohibition. So let's do turn, if you don't mind, to what it is that the statute actually does. It is an important point. First, I am going to come to our brief, but I just want to read something. For your later reference, I'm going to have been reading from page 42 of Pharma's brief. And this is what the State told the Second Circuit, Quote, ''Data vendors may continue to acquire, edit and sell this information to whomever they choose, so long as that person does not use the information for detailing.'' In turn, the Second Circuit What was your page again? Sorry. That's going to be from the Pharma brief, the other red brief at page 42 at the top of the page. So to whomever they choose, so long as that person does not use the information for detailing. The Second Circuit said, okay, you're the State, here's how we understand the statute. The statute only imposed, quoting again, this is from 22a, it's the language that Justice Alito quoted, The statute only imposes restrictions on the sale or use of such data for marketing or promoting a prescription drug. So that's what they understood the statute to do. Now, then the question becomes, why did they do it? This was, Justice Scalia, you tried really hard to get them just to admit. Let's just acknowledge what the point is here. And the State tries to deny that the purpose here is to limit the information getting into the hands of the doctor. We don't have to rely on the State's lawyers. The State legislature was very helpful here. So if we go to the appendix of the IMS brief now, page 1a, okay, right at the top, the State says their goal is, this is finding number one at the bottom of it, containing health care costs. Then in finding number two, they explain why they did it. There is a strong link between pharmaceutical marketing activities, health care spending, and the health of the Vermonters. Then finding number three, the goals of marketing programs are often in conflict with the goals of the State. And my favorite, obviously, is number four, the marketplace for ideas on medicine safety, the State determined, was operating in conflict with the goals of the State. They didn't like the marketplace of ideas. Now, it is true, we acknowledge, that another thing the State wanted to do was to give the doctor some more control. I mean, it's an — there is an opt-out option. But can I just take you to how the State explained what it was doing? That's just going to be on page 7. Now, the State's lawyer and the Solicitor General have explained to you that they believe that doctors were concerned only with marketing and only with marketing to them. That's not true. Finding 29, we have to go all the way to number 29 to get to this goal of the State. Health care professionals in Vermont — I'm on page 7 — health care professionals in Vermont who write prescriptions for their patients have a reasonable expectation  will not be used for purposes other than the filling and processing of the payment for that prescription. It's not just about pharmaceutical marketing. The doctors say — and we all love this. There's stuff about us in our daily lives that we wish was entirely private. The doctors here said, hey, it would be great for us if this information, we had complete control of it. Doctors also would love if medical malpractice judgments weren't broadly known. There are all kinds of government records they would prefer not to be out in the public sphere. But then we ask ourselves, all right — and this is why I asked you to have this brief available — what did the State do? Did the State, in fact, enact a general privacy provision? Is it like HIPAA? Or instead, is all that the State did here target the use for marketing while it allows the use of the same data for the opposite message by insurers and also by the government? So here's the statute. It appears on page 9 of the appendix. I want to start with subsection A, because the State helpfully reiterates its goals here in the second half of this paragraph. The State sought to ensure costs are contained in the private health care sector, as well as for State purchasers of prescription drugs, through the promotion of less costly drugs and ensuring prescribers received unbiased information. That's what they're trying to do. They're trying to say, we'd like the drug companies to have a harder time finding the doctors, while the insurance companies and the State have an easy time finding the doctors. Roberts' But there is another interest here besides the State's concern about health care costs, and that is the physician's privacy interest. You can sell this information to whomever you want, right? You can sell it to a journalist who wants to expose physicians in a particular area who prescribe a lot of a particular medication, so the public can discern, well, this is the guy who is treating these people, and we don't like these people, so we're going to pick it outside his clinic. Now, nothing prevents you from doing that, right? That's correct. Roberts' Well, don't you think that's protecting physicians' privacy to prevent that from happening? Oh, I apologize. We are allowed to do it before and after the statute, is my point. Remember, what the statute does is — and this was the debate that Justice Alito tried to point us to about what the statute actually does in the Second Circuit, what it understood the statute to mean, and I should also say the cert petition didn't say that there was a problem with that. Vermont picked out one thing. It said, look, when drug companies can find the doctors easily, they can persuade the doctors to use more expensive drugs. We pay a lot for drugs. We would prefer that not happen, so we're going to make it harder. And the state will have its counter-detailing program, it will have its drug utilization review program, and insurers will advocate for less expensive drugs. All the other uses are still permitted. If Vermont were serious about protecting the doctors' privacy, as opposed to kind of a right of publicity, a control over information about them, it wouldn't have all these exemptions. It would have a provision that says this is private information. But the big question is, is that the Federal Trade Commission, after a 3-year study of pharmaceutical manufacturing practices, finds the following. They say, we have found that when drugs are sold to doctors, it is very important that the doctor find out what's curable, what the drug does, how much it costs. And by the way, all those things apply no matter who the doctor is. Who the doctor is, is irrelevant. And therefore, marketing that focuses upon who the doctor is and what his previous practices were is irrelevant and harmful and false. And therefore, we find that it is a false and deceptive practice under Section V of the Federal Trade Commission Act to use the following prior practices of the doctor in selling him new drugs, because it's irrelevant and because it's false and because it's harmful. And they enact that as a rule of the Federal Trade Commission. Does the Constitution of the United States forbid them, having made those findings in detail, from controlling advertising to prevent what they have determined is a false and misleading practice? I do know the First Amendment applies to the rule. Nobody says it doesn't apply. They do. I'm not interested in what they are saying for the present purposes. I'm interested, surprisingly enough, in what I'm saying. So therefore, I would like to know the answer. This is a highly regulated industry. If the Federal Trade Commission specialists and experts in false and deceptive advertising concludes that this is a false and deceptive practice, are you going to say that the Constitution of the United States forbids them from doing that? I am. But I'm also going to say that I don't have to win that argument to win this one. Well, you say you are. Is there any precedent that says they can't regulate false and misleading practices? Of course, you see where I'm going. If they can, why can't Vermont? Sure. If it's actually false and misleading. Well, they said it was biased, and they have made a study of it in the legislature, and that's their conclusion. I don't think that the government can say that because speech is so influential, it's false and biased. But I will say, Justice Breyer, in my defense, that the Constitution of the United States states false, biased means one-sided. Yes, that's exactly right. And what we like is for- You state the true facts only on one side and not the other. Right. All right. But now, there's a point- This case has not been argued as a case restricting false advertising, has it? No. It's a case about restricting true advertising. Oh, yeah? Well, yes. Could I just make one point really quick, and that is, you descended in Thompson v. Western States, and your dissent in that case says, these are drugs, the compounded drugs there, that have not been approved by the FDA, and I'm very concerned that you're evading the FDA regulatory requirements about truthful advertising. These are the opposite drugs. These are the drugs that all the messages that are being conveyed here have been preapproved by the FDA. This is truthful and accurate speech, and the State only wants one side of the debate to get- That's where I was going. Okay. I chose an example that's beyond your case. That's why it's called a hypothetical. All right. But that's why I wondered how you'd respond to that. So you sort of – I thought that was one that was going to be obviously constitutional, but you're going to stop me there. So what I want to say is, how is this different? And I suppose I don't know the extent to which this does or does not promote unbiased information from going to the doctors. And isn't that a matter for the doctors themselves and the Vermont legislature rather than this Court to decide? Sure. A couple of things about that. First, as I said, these are messages that have been cleared by the experts. The FDA has to review all the detailing communications. Second, the doctors do get to say, I don't want you to come visit me. They do that all the time. My dad's a doctor. He doesn't visit with detailers. This is instead a rule about whether you can talk about about someone, not talk to someone. The drug companies and the intermediaries are talking about drug – about prescriber practices, and you can decide who you want to try and approach. There is nothing alleged to be false or misleading. Third, the way the First Amendment works in the marketplace of ideas that so upsets Vermont is that both sides get to tell their story, right? The thing that is supposed to be biased here is that the drug companies have too much money. That is not a basis for restricting speech. The way it works is, if the message is accurate, as the FDA has determined it to be, the drug companies can go make their pitch. Vermont can come along and make the opposite pitch. Terrific. So can insurance companies. But what you can't do is have a rule that says one side is going to have a much harder time getting to their audience. Sotomayor, I understand your argument, and I have a difficulty. Today, with the Internet and with computers, there is virtually no privacy individuals have. Any transaction you do could be spread across the world instantaneously. And for the longest time, catalogs would sell your name and address to other catalogers, and if you bought one product from one company, you would get a thousand catalogs from 50 million others. Today, the industry is policing that, in part to get the state not to intercede, by giving you an opt-out option. And so if you're a consumer who doesn't want a million catalogs, the industry is giving you the right to opt out so they don't sell your address. If there is, as I see, some interest that the state legitimately has in protecting that part of the public who says, I entered into this transaction, I didn't really want you to sell my name. I didn't want you to do other things with it. All I did was this transaction. Why can't the State say, there is a difference in my mind between an opt-in and an opt-out. Why can't the State say, your desire to enter a transaction in which you're doing just that transaction and not others is something we can protect? It can. And let me explain why it is that that rule, and let me typify it for you. There is a pending bill in the Congress called the McCain-Carey Consumer Protection Act, and it does what you're talking about. It says we're not just going to leave this to the industry. We're going to have a set of governmental rules. Let me distinguish that bill from what goes on under Act 80. What that says is that if you are a consumer and you engage in a transaction, you have the right to opt out of any unauthorized uses because it's just between you and the business. Right? So there are three differences between that and this. The first is the structure of the statute. That's not what this statute does. This statute says every use of the information is just fine, except this one, this one that allows one speaker who we don't really like to go out and convey its message. The second difference is the public importance of the speech involved. What that consumer information would be used for is to make some random consumer pitch to you or about you. This is information about life-saving medications where the detailer goes in and talks about double-blind scientific studies that are responsible for the development of drugs that have caused 40 percent of the increase in the lifespan of the American public. So there's a tremendous difference in the public importance. The third is the fundamentally different nature of the privacy interest. Unlike your consumer transaction over the Internet, this is a doctor. You can call up any doctor's office and find out what their prescribing practice is. It's part of their business. Imagine the following conversation, if you will. And that is — and if you want to look for a place in the common law where this comes from, it would be Section 652d of the Restatement Second of Torts, what things are private and what aren't. And it asks whether a reasonable person would be outraged. If one doctor were to say to another one, do you know what, Dr. Smith told people that three out of four times I prescribe Acefex as a proton pump inhibitor, would anybody be outraged about that? No. But if you knew that the company that you bought from on the Internet was selling that information, or if they were giving away private medical information, you would genuinely be outraged. So, Justice Sotomayor, the reason I started this argument about it has to end up in the middle is we know that statutes like that have to be constitutional. At the same time, we know that the government can use controls over information to really distort speech. So the question is, what happens in this statute? And this statute has a structure that's not intended to protect privacy. It would look totally different. Sotomayor, I read one of the briefs that pharmacies were not permitting either patients and or doctors to opt out, that if a patient came in and said, I don't want my doctor's information sold, or doctors called a pharmacy and said, I don't want you to sell my information, that pharmacies are not respecting those limitations. So why don't I read this statute as simply doing what the consumer statutes are doing, which is giving people some control outside of the limited transaction that they're engaged in? Sure. A couple of things. Remember, the patients have nothing to do with this. The State doesn't give any control to the patient. That would be true before or after. So we're talking about the doctors. I did concede, when I read you finding 29 at page 7 of the appendix, that this does give a little bit more control to the doctor. I mean, it just does. May I stop you when you said this statute doesn't give the patient any control, but the patient is already taken care of by the Federal law. You can't – I mean, the patient is protected. The question is whether the physician should be as well. I agree, Justice Ginsburg. Justice Sotomayor, in her question to me, said, why don't I read this as giving – she said that they aren't giving patients options about what happens with this prescription information. My only point was that this statute doesn't change it. You're quite right that our position is no threat to the protection of private health information, which is reasonably regarded as extremely confidential. So on the question of whether it does give some greater control, it does. But what – the thing you have to focus on here is the line that it draws in when it gives greater control is a line that's intended to discriminate against a speaker. Right? So you have to look. Take – I'll give you an example of this. Cincinnati v. Discovery Network, the city of Cincinnati came to you and said, look, we eliminated the commercial news racks, and these people who want to sell their commercial stuff should use something other than news rack. We're targeting the blight that comes from commercial news racks. This Court said, look, you can't redefine your interests to reflect your statute. You can't just – Could the Federal power – the Federal Energy Regulatory Commission say we want you to collect certain information about who's using what natural gas and give it to the fire department? It's for the fire department in case of emergency. And what we don't want to have happen is it's used to stove manufacturers to sell homeowners gas stoves. They could do that. Yes, that's LAPD v. United Reporting. All right, fine. If they could do that, why can't they do this? Because the key point in LAPD v. United Reporting is that it's in the hands of the government. Let me – Well, this is information – see, this is information that starts off being collected because the government requires it to be collected. So it's there for that reason, and the government says we want you to get this information. It's done for this purpose, so you know other purposes. And we don't want it to be used for commercial advertising purposes. That's what they say they've done in this statute. That's what they say. They're just not right. The – this information, I would direct you to the amicus brief. You don't have to pull it out right now. But for later, the brief of the National Association of Chain Drug Stores, if you just make a reference, on pages 10 to 11, collects the history of how this information has been gathered. And they make the point that the Court did in the first 30 minutes, that of course the doctor is going to put his name on the prescription. We have to be able to call the doctor and say, I can't read your handwriting. Suppose you had a statute in which the pharmacy cannot give the information or sell the information to anybody. It must remain with the pharmacy. A copy of the prescription must be given to the State of Vermont. The State of Vermont then has the same restrictions that this statute has. That would be LAPD. That would be LAPD. If the – it would be almost LAPD. And what – and I want to know what your answer would be. If LAPD is correct, then what – then what ruling would we have to make in my hypothetical? Sure. If it's in the hand of the pharmacy – so let me just, to make sure I'm on the same page, I am going to answer your question directly. The pharmacy can't disclose it to anyone else. The government gets a copy of it. That does not make it LAPD. If the pharmacy was government-owned, that would be LAPD. Now, let me answer your hypothetical, right? Because LAPD, it was an arrest record. It was in the hands only of the State. The Court said, look, this is the State's information. Justice Ginsburg's concurrent says it's like a subsidy, the decision whether to give it out or not. Now, in your hypothetical, which is it is in a private hand, but it is banned for any other use, that would be a real privacy statute. I think that it would still be unconstitutional, but it would be much closer. The reason it might be unconstitutional is twofold. First, that the privacy interest in it, I think, is not very significant, because it's how the doctor runs his or her business. And second, it would still allow the discrimination. If you were convinced in your hypothetical that what Vermont was trying to do is what it said it was doing here in its findings, and that is to make it harder for the drug companies to reach their audience and make it easier for the insurance company and the government to reach their audience, Greater New Orleans Broadcasting, which involved a ban on private casino speech, but not tribal and governmental speech, says discriminating against speakers like that is very troubling. So that's, I think, how your hypothetical is. Sotomayor So what you're saying, I think, to Justice Kennedy, is answering my earlier question by saying the State cannot constitutionally stop the spread of information. So if the State said to the pharmacy, all you can do is fill the prescription, that's what doctors think pharmacies are doing, and that's all you can do, you're saying that's unconstitutional? I am saying that that's unconstitutional. I am also saying that the reason is very specific to this kind of information, that is, that it would allow speaker discrimination. And I am also saying most emphatically that is not this case. That would be a much closer case. It would look much more like a real privacy statute. What I would take from the hypothetical is not the lesson we should lose, and you should never take that lesson. But instead the lesson that that's what's so different about this statute. This statute, as in all the language quoted earlier, says Katie, bar the door, do whatever you want to do with this stuff, just don't do something that we disagree with when it comes to the message. Sotomayor So you're really — you are really hinging your argument on the discrimination aspects, that drug companies or detailers are being treated differently than any other user of this information. That is a principal part of our argument. I did say before in describing the Kerry-McCain bill that there were three things, not just the discrimination, but the greater public interest of the detailer's speech and the lower privacy interest. So I wouldn't throw those out. Now, can I just preempt an argument that my friend from the State of Vermont is going to say in her rebuttal? And that is, she's going to come and say that, look, the insurance companies are actually paying for the drugs, so all their — this exception is not one that's about advocacy. And I just want to make sure we all know ahead of time, because I don't get a server rebuttal, that that's not accurate. So if you still have the I.M.S. brief with you at page 53 this time. So at page 53, the first paragraph is about the State's own use of this information for a variety of purposes. There is — the reply brief for the State introduces a debate about whether today they are using the PI data for counterdetailing. There is no dispute that they use it for other State programs, like the drug utilization program. That's the quotes in the first paragraph. But the better paragraph is going to be — it's the second paragraph. It starts, the State's — the statute's parallel formulary compliance exemption. And this paragraph talks about advocacy by the insurance companies. So it's not just that the insurance company says to the doctor, I'll pay for $5 for this drug. But the insurance companies take PI data under the exemption in the statute, go to That is straight-out speaker discrimination. So we quote Colassa, In just — this is a further quote. In just the last couple of years, there has been an amazing increase in the amount of information provided by payers, insurers that will send scientific documents to physicians — I've rolled over to page 53 — will call when physicians are prescribing too much or too little of a product and provide them with information. It goes on and on, virtually several times a day. So that is the message that I would take away from the argument, and that is we are emphatically in favor of the constitutionality of HIPAA, of the McCain-Carrie bill, the things that concern you. You have to decide this case in the middle about what Vermont actually did. And it was unbelievably candid about what it was trying to do. It said the marketplace of ideas doesn't work for us. And so it designed a statute, and you can decide this case very narrowly on the ground, that what Vermont did here is it went too far in just saying we're not actually trying to protect privacy. What we're trying to do is give the doctors control when it suits our own best interests. I do want to preempt one other last argument, and that is the suggestion that this isn't paternalistic at all, right? We just let the doctors decide. But the State's goal, what the State is trying to do is paternalistic. The reason the State picked this one exemption, the reason it picked between these speakers is because it doesn't want this message to get to the doctors. And if you can keep this in mind. Breyer, it used to be true there was something called a regulated industry. Yes. And selling was simply one activity among many. Sure. And there were lots of regulations that could be imposed upon selling. Sure, right. Are you saying that all those should be reexamined? I thankfully am not. Here are the cases. This was the argument that was made and rejected in Virginia Board of Pharmacy, which was about a pharmacy rule. They said that it would be unprofessional. Then the Solicitor General, in the person of Mr. Kneedler, came to you in Thompson v. Western States and said, we need to stop this compounded drug marketing because this is heavily regulated. This is a closed market. And the Court said, I'm sorry, no. The nature of a marketplace of ideas is you get to say your piece and the other side gets to say their piece. The FDA heavily regulates this area. The information is perfectly accurate and it's incredibly valuable. You would have no objection, I take it, if there were not the academic exception and if the State didn't push its own contrary program? We would have much less of an objection. And that's no accident. Let me just say, this is not a flaw in the drafting. The State really wanted to push its countermessage. And thankfully so. This government has a real interest here.  But so does the other side of the debate. And what the State doesn't get to do is just pick sides and prevent the debate from happening. How would you, if you were truly concerned about physician privacy, you didn't want people to know that this physician prescribes this drug more often because it tells you a lot about his practice that he may not want known, how would you write this statute? You would take Justice Kennedy's hypothetical. And I don't think the Court has to confront whether such a statute would be constitutional because it would be very different. Would you remind me what Justice Kennedy said? Sure. He said, the rule is the pharmacy can't give it to anybody. Okay. How about the pharmacy can't sell it to anybody? I don't understand why that protects privacy. That protects against commercialization, but I don't think the government has nearly as much interest in commercialization as it does in actual privacy. Section 652d of the Restatement of Torts doesn't talk about the outrage of being able to use the — we have a capitalist economy, and we sell newspapers and books and those sorts of things. Commercialization isn't a bad thing. It's a question of whether privacy is genuinely protected. Could you do it? It's not exactly this case, but just in the abstract. Do we have a rule that if there are two statutes, A, the statute is passed for a bad purpose, B, the statute is not passed for a bad purpose, if the statute is otherwise the same, are they both unconstitutional or just one, and why? In what case do I look to other than maybe Church of Lukumi? You look to — yes, we win. Thompson v. Western States. Remember what the government's argument there was. If you allow the marketing of compounded drugs that are not FDA-approved, you will evade the very important FDA regulatory program. That was a perfectly important rationale. And the Court said, but it also has the purpose of keeping information out of the hands of doctors. It's unconstitutional. I'll give you another example. Gross Gene, Minneapolis Star, and Raglan, those are cases about taxing the instruments of communication. So a tax on newsprint, a tax on ink. And the Court said, we're not worried about your bad motive. You have a very important rationale in trying to raise revenue. That's a perfectly valid purpose. But what you're also doing is you're picking out the press and you're making it harder to speak. It's unconstitutional. Roberts. This is, Mr. Kneedler explained, this is the government's information. Why can't the — you wouldn't have to have it if it weren't prescription. It was the fact that it has to be prescribed that requires this information. The government frequently controls the use to which information can be put. It makes me file a tax return, and it doesn't allow, you know, dissemination of that. It restricts it. And presumably it could say that if an accountant prepares my tax return, that accountant can't sell it either. How is this any different? Oh, okay. Two pieces to the puzzle. The first is, why can't I demand it from the IRS, okay? And the second is going to be, why can't the accountant give it away? The first one is LAPD. And it's also the same true — same thing is true of campaign finance reports. The government has plenary authority. When you give information to the government, what the government then does with the information. The important lesson to be derived from LAPD is that nine members of the Court seemingly agreed — and I defended the statute in that case. Nine members of the Court in that case agreed that if this had been private reports rather than the government's reports, then the statute would have been unconstitutional. The reason your tax preparer can't give it away, the reason I can't give away attorney client secrets, the reason that the government is going to be able to tail Internet companies, that they can't give away the consumer information, is that it's really private. But what if instead the government had a rule that says tax preparers can't give out But if it will encourage people to comply with their taxes, it's perfectly fine. You can't draw lines that are intended to discriminate against speakers. That's the main principle of our case. Thank you very much. Thank you, counsel. I'm going to say you have five minutes. I'd like to begin with the point that my friend was making about the use of the information by insurance companies. Insurers are not similarly situated to pharmaceutical manufacturers. Insurers receive information directly from doctors and patients in the ordinary course of their business, and they use it as part of providing and paying for care to patients. And when my friend described the fact that insurers do that with doctors' information as speaker discrimination, I would like to point out that not only the record, but the examples, for example, that PhRMA points to on page 12 of their brief show that insurers have patient information for that purpose as well, HIPAA allows those uses of both patient and prescriber information to manage benefits. So to argue that pharmaceutical manufacturers are being discriminated against if they don't have access to the same health care information that we provide to our insurance companies would begin to raise serious questions about a statute like HIPAA. And that just highlights that in this area of private information and information control that many of these statutes are structured in such a way that there are expected and intended and permissible uses of information and other uses for which people are allowed to have control over the further use of their information. And here we're talking about the control allotted to doctors. We place an enormous amount of trust in doctors to make the right treatment decisions for their patients. Part of their ability to make those decisions depends on the information that they receive and what doctors have said to the Vermont legislature and to the court in this case is that many of them find this practice objectionable and that it is not helpful to them or to their patients to have their information monitored for this marketing purpose. And all that they've asked for is the right to object. And I would like to say I want to give you a chance to respond to the point that was highlighted by your friend, which is the fourth legislative finding, which does seem to say that the State's doing this because it doesn't like an imbalance in the marketplace of ideas. Thank you, Your Honor. The findings, first of all, have to be taken as they were adopted, which was in support of not this statute even as it was written, but as a much larger bill that contained many sections including a provision that created the evidence-based education program, which is a clinical, a program to provide voluntary education to doctors. And to the statute as it used to be written, which not only had this provision for the doctor's choice and the use of the information, but also mandated that pharmaceutical detailers provide information affirmatively as part of the marketing. Do we have, were there findings with respect to the statute as enacted? There are no findings that accompany the amendment that resulted in this statute. And to return to, I think, to Justice Kennedy's point from earlier, the statute, I think, has to stand or fall on the restriction that it allows for doctors. The Court, for example, in O'Brien, discussed the fact that striking down a statute because the Court disagreed with the record would simply mean that the legislature could adopt the same statute again on a different record. We would say here that what the question before the Court really is, may doctors have this opportunity to control the use of their information about their non-public information about their prescribing practices as a marketing tool or not, and that that should be the focus of the Court's inquiry. I'd also like to just return to the point that I believe I was making earlier, that this statute is so different from the cases in which the Court has considered restrictions on the direct commercial advertising and the provision of information to the public. This is an entirely non-public commercial transmission of data. It starts with a private commercial transaction. It's a private commercial exchange between the data vendors and the pharmacies. It's used in a way that it is never disclosed publicly, never included in the advertising message. There's no restriction here on the information that's provided to doctors, the truthful information that the FDA permits to be provided about prescription drugs. And there's no restriction on an exchange between a willing listener and a willing speaker. I believe my friend suggested that anyone could call a doctor's office and find out by asking what the doctor prescribed. Pharmaceutical manufacturers can do that as well. And if the doctor volunteers that information, there can be that exchange of information. The statute does not restrict that. Roberts. I take it there's — it's against the law for a physician to say, I want you to fill this prescription at a particular place, a particular pharmacy, because I know that pharmacy doesn't sell the information? They can't do that, can they? I don't believe they can, Your Honor. Thank you. Thank you, counsel. Counsel, the case is submitted.